This is CalSTRS v. Homestore, Inc. and many other distinguished parties, all of whom I won't name now. But we welcome distinguished counsel who have come to illuminate us on this case. Why don't you take a minute or two and get settled, and then perhaps someone can tell me how the argument may be divided between the different counsels. We do have this set for 20 minutes for each side, and it's a very complex and important case. Each side, not each party. Each side, yeah, not each party. We can stretch our time limit somewhat, but not too much. So we'd like each side to try to handle it in 20 minutes. But if my colleagues want to go along with some additional time, we'll try to do that. But in general, how would you divide up your time? Let's hear from the appellants first. On the appellant side, Your Honor, the ACs have given all their time to the appellant itself, so there will be only one. Okay, that's simple enough. Now, on the appellee's side. From the defense side, Your Honor, I represent a non-lawyer, and I'm going to defend the principle argument on the accommodation of the appellant. Okay. Counselor, your name? Peter Walden. Okay. Okay, so now for the appellant, did you say Mr. Kochet? Yes, Your Honor. Mr. Kochet will go first, and then Mr. Barber. All right. Thank you, please proceed. Thank you, and I would like to reserve five minutes, if you don't mind, Your Honor, for my rebuttal. Joseph Kochet. I'd like to ask you a question right off the top. Go ahead. When I first started picking up the first brief in this case, I read the term business partners. Where did that term come from? Very good. That term was agreed upon by all parties as to just give some name to differentiate the active partners from a whole series of about 13 or 19 other third leg of a triangle. Well, I'll tell you what that did to my thinking. I'm reading the word partners, and the implication is that there's a whole bunch of partnership law involved in this. And I take it that by the time I got through, I was convinced there was none, and that partners was really a complete misnomer. It is. And in fact, there is no partnership law. Well, it wasn't very helpful, I'll tell you that. Well. And the other thing that happened to me, and I'll just give you this as free legal advice. There are a whole bunch of defendants, and I get a whole bunch of red briefs, and I get a lot of repetition. And this court, through our scheduling processes, will permit parties on one side or the other to file a single brief, but will extend the page limitation to accommodate all the defendants that could have been in this case. And we got a lot of repetition in our reading because of the way the thing was briefed by counsel. That part was not terribly helpful. But anyway, we understand your case. You can proceed. Thank you, Your Honor. Joseph Tachet for the California Teachers Retirement System. Very quickly, let me run through this, since we're all limited with time this morning. What the defendants have argued collectively, I will not refer to them as business partners, but what they referred to collectively. There's only three main partners left. I shouldn't use that word, partners. Three principal defendants left. That's AOL, Time Warner, Senden, and L90, which I'll refer to individually. BPDs. Thank you very much, Your Honor. The BPDs. If you read their briefs, which I will say was repetitious, each one argued that we are trying to rewrite Central Bank so we can put that issue to bed. We are not here to rewrite Central Bank. But quickly, we have to look at Central Bank just to understand why we're not here to rewrite Central Bank. Central Bank out of Denver was a trustee on an indenture securing some bonds that went bad. They were a passive player in the whole Central Bank scheme. The claim against them is very significant. The claim that went to the U.S. Supreme Court out of the Tenth Circuit was, could they be held as an aider and abetter as pled? They were pled to be an aider and abetter. The court said in a 5-4 decision, no, they were at best negligent. They couldn't be involved in aiding and abetting. You've all read the opinion. We know it's a celebrated opinion. They said there is no aiding and abetting under the securities laws, so let's be clear. We are not here to rewrite Central Bank as alleged in the defendant's briefs. So you accept the rather broad definition of the Supreme Court as to what aiding and abetting is? And therein lies the distinction. We take the position that you, Judge Visa, participated in the key case, which we believe determines the outcome of this case. But let me go from the difference between Central Bank and this case and make it absolutely clear. The difference is that you read that the acts they committed were all legal acts. In other words, the round-trip transactions, the three-legged turnaround of money, the swaps, the pyramid scheme, everything they were involved in was legal, but it was the homestore people that committed the illegal act in putting out the information to the public. Having said that, let me come to the defense of the district court judge just quickly. This case was filed in Los Angeles in the Central District some years ago. It languished before four different judges because at the time, you'll recall, there was a problem with whether or not, excuse me, some vacant seats. There was a massive caseload in the Central District. The case got transferred up to Seattle to Judge Peckman, who I believe very courageously volunteered to hear the pretrial in this matter, as many other district court judges picked up material from all around. Why is that significant? Only to the effect that this massive file, and it was a massive file, goes north to Seattle and the very first motion she gets hit with. She's sitting as a designated judge of the Central District of California. That is correct. That is correct. I'll blame it all on Seattle. No, quite to the contrary. Quite to the contrary. I want to defend Judge Peckman because she gets hit with boxes and boxes that are shipped up there. And the first thing she's hit with is a massive 12 v. 6 motion. Now, where is the case today? She decides the 12 v. 6 motion, which is before you. The case then gets sent back to Los Angeles, where it now sits, no trial, no disposition. It now sits waiting for the criminal trials to move ahead. So for purposes of this appeal, we are at the very beginning of the case. In other words, it hasn't gone anywhere for trial. It can't until the criminal matter is resolved. Now. Was this the first complaint? Have there been amended complaints? There was a first amended complaint, yes. That got done in Los Angeles before it got shipped up to Judge Peckman. She made her ruling on the first amended complaint. Yes, Your Honor. Now, the complaint was 244 pages long, as detailed as one could get. And as she accurately pointed out from the plaintiff, as she accurately pointed out, it was all based upon insiders who would come forth and give statements to both the U.S. attorney and to the plaintiffs in this case. That's important because what she did, in her opinion, was detail factual allegations that she admitted and said, and others have said, they have never seen allegations like this in your run-of-the-mill securities case. For example, she points out that in May of 2000, Homestore entered into an agreement with AOL. This is all before discovery now, mind you. She pointed out in great detail how 3.9 million shares were transferred to Homestore in return for a round-trip event. She pointed out, quote, that the agreement received a great deal of news coverage, and analysts predicted Homestore would exceed its stock price. In other words, she went on to say as to detailing each and every act, she concluded that these were very serious matters and said, quote, if I just may read this, this case does not present the question of whether the fraud happened, but rather who knew it, who participated in it, and who could be held liable for it. Now this then trips the point of no return in that she described the acts as, quote, are false revenue transactions without which Homestore could not have manipulated its revenue numbers. Now attached to the complaint was Exhibit A, and Exhibit A was an indictment and or information filed by the U.S. Attorney's Office, who had taken statements which was incorporated into the complaint. When you read counsel's brief, you will note they argue that the acts they committed were legal, but if they weren't legal, they didn't tell the public about it. It reminds me of what you just said, Judge Nelson, when you said, it's common for someone to say, I wasn't there, but if I was there, I was insane. Now let me tell you what the U.S. Attorney found, and that is pled, which we accept as true under this de novo hearing. This is the exact quote from the complaint. In order to achieve the goals of the scheme, Homestore entered into agreements with various intermediaries to facilitate the circular flow of money from Homestore to the various intermediaries. These round-trip transactions and the accompanying circular flow of money enabled Homestore to recognize its own cash as revenue in violation of GAAP. These illegal arrangements allowed Homestore to fraudulently inflate its revenue by buying the revenue in violation of accounting principles. How does the complaint allege that these actions, which the district court thought were undoubtedly a fraud of some kind, how does it make these particular defendants liable under the 1934 Securities Exchange Act? You have moved right now to the heart of this entire appeal. You got it. So now we go to her decision, and she explains how she got there. And I will explain how I believe. Unfortunately, she was misled by the briefs that were filed. And now I might add, now when I read their briefs, they're now claiming that they really didn't mean to argue to Judge Peckman that they were, quote, in a special relationship. Because at page 1040 of her decision, she answers the question that you just asked, which is, Judge Gould, quote, the scheme and primary violator requirements. And she goes on to explain that to be liable under 10b-5 and the three prongs, A, B, and C, you must be a primary actor in the scheme. And here's what she says, quote, she acknowledges that Cooper v. Pickett, written by this court, is a proper test. She acknowledges that. Because counsel argued to her, Cooper is the test, but Cooper doesn't go far enough. Because what Cooper doesn't tell you, Central Bank does when it uses the language including accountants, lawyers, and banks. And Judge Peckman said, quote, Cooper establishes that scheme and aiding and abetting are not equivalent. In other words, what this court said, the Ninth Circuit, is that a scheme or an artifice to defraud or a manipulative device is not aiding and abetting. She agrees with that. Unfortunately, she says, the term scheme was not defined in any meaningful way. In addition, there is no indication that liability for participation in a scheme can extend beyond the corporate officers, who she held in, and those with a special relationship with the corporation. And that's where we develop the term business partners, Your Honor. But not so. But not so. She got hung up on the argument that they made below in briefs this high, that there had to be a special relationship or you had to be an accountant, a lawyer, or a bank, as the Supreme Court said, using the word including. Obviously, they were just saying that there could be many difference, because the statute on its face says any person. And what the argument below was from the briefs, you see, is that the term any person only meant corporate officers or those with a special relationship from the corporation. Now I note that on this date, as we stand before you, the briefs filed before you, they now say, well, we really didn't mean that. And now they concede that that's not the law, because now they concede that any person means any person. But what now they do say is, however, she was right for a different reason. And let me come to the different reason, which is part two of the answer of your question, Judge Gould. Because they admit she was wrong on special relationship. Now she goes to part two. Further, the scheme, I'm going to quote to her, the court holds that other actors, such as AOL and its employees, who actively participated in the triangular transaction scheme, did not employ the scheme to defraud the investors and therefore are secondary violators. Let me just break that down. In other words, she said that they couldn't be primary violators because they were not in a special relationship. But the scheme they employed never went to the investors, because the scheme was not employed by Homestore when it told the investors what their stock was doing. Now she goes on to say, and that's her rationale for special relationship, now she goes on to say the requirement of statement or omission. She starts by stating the law. It is true that no statement is required to violate 10b-5. The Supreme Court just said that three years ago. In a statement, almost directly from their briefs below, they stated, quote, however, we may have been at the crime, but we were crazy at the time because the plaintiff suffered no damage from us because the plaintiff didn't rely on the scheme that we put together. They now admit the scheme. But the plaintiffs across the country didn't rely upon the scheme. Nowhere in the defense briefs or nowhere does the court cite basic V. Levenson because now she says, and she took almost from the brief of AOL, quote, that the plaintiff did not rely upon the scam that was going on behind the scenes. It relied upon a statement. Well, unfortunately, we know that there was a tragedy that happened in the 244 pages. We know that as descendants, they even put out a joint press release explaining on November 20th, 2000, October 20th, excuse me, they put out a press release about a deal they did, a joint press release with Home Store, wherein they gave them stock worth $795,000 in return for a circular transaction where they bought moveon.com. Seventeen days after that statement, they put out another statement saying how great their earnings are. Now they got rid of moveon.com. That is found in the paragraphs as set forth in the complaint verbatim. Unfortunately, Judge Peckman, in writing the opinion, said there was no statement whatsoever. We know as descendant there was. As to AOL, they did not participate in the statements. Now, let me just conclude and save my time by saying that Zanford Zanford said just three years ago, quote, no statement is needed. Neither this court, the U.S. Supreme Court, nor the SEC ever required a statement. In Howard versus Everett, this court, the Ninth Circuit said, we have held that substantial participation, which is the test, which they really can't contest because they were involved in the triangles, in the swaps, which they now admit. We have held that substantial participation or intricate involvement in the preparation of fraudulent statements is grounds for primary liability, even though that participation might not lead to the actor's actual making of the statements. The SEC filed a comprehensive brief here that spells all of that out. In affiliated ute at page 129 of the U.S. Supreme Court decision, they concluded that the court of appeals below errored when they said, quote, there is no violation of the rule unless the record disclosed evidence of reliance on a material, factual misrepresentation. The Supreme Court affiliated ute said the circuit court was wrong because all you have to do is read A and C and it says, quote, we do not rule 10b-5 so restrictively. To be sure, the second paragraph specifies an untrue statement. The first and third, referring to A and C, are not so restrictive. These defendants' activities outlined above disclose within the very language of one of the other of those paragraphs, quote, a course of business which was fraudulent. Again, I come back to, and I'll close and save my time, the evidence is replete with links to the documents they put out. Isn't that an abetting of the scheme under B, per se? When you say under B, it's A, B, and C. B is false statements. A is a device or scheme. C is a course of conduct, fraudulent course of conduct. Under A and C, they are liable. Sending, of course, clearly is liable under C as well because they participated in a statement which, as we spell out in 244 pages, was fraudulent. Yeah, but is the statement fraudulent as to this plaintiff or is it an aiding and abetting? I mean, in relation to the defendants or is it just an aiding and abetting? And the courts have said. Subject to central. I'm sorry, Your Honor. Which would be controlled by central? Central bank. If we were in a situation of where we pled aiding and abetting and the facts only showed that, by the way, I might add central bank says clearly, this is not to say that people can't be, other people can't be, primary wrongdoers under 10b-5. Central bank clearly says that. Zanford just two years ago, three years ago, excuse me, said it in spades. Zanford said you not only don't need a statement. They talked about course and conduct under a and b. Zanford and your case of Cooper v. Pickett is the controlling law here. Cooper v. Pickett. I might add that there is a case. If we analyze what these swaps were, these swaps were the classic pyramid scheme. What they did is they took money from one of those 19 vendors. We're familiar with all the facts. Well, we know it's a swap. We know it's a pyramid scheme. We know it's anything you want to call. The money went round circular and eventually it had to stop. In your case, this very 9th circuit held in Webster, 79F3rd776, and I apologize profusely. If that's not in the briefs, I'll file a 28J letter. But in the Webster case, this case held as a matter of law. Just the pyramid scheme itself violated 10b-5. That's a very significant issue because it's what the SEC talks about in their AC brief. You can't get any more direct than Webster at page 787 in its language. And I am apologetic to tell you, as I'm flipping through my index of cases last night to find Webster, I don't find it in my brief. I find it in some other briefs. Mr. Koch, what I suggest is if you could bring your initial argument to a close, we will permit you several minutes of rebuttal. Thank you. And we'll add some time for the defendants. One last point, then. Shiarella, what the defendants led Judge Peckman to believe is that there had to be a statement always made by the defendant, or you couldn't be a primary defendant. That's just wrong. Shiarella, as we discussed in our case to U.S. Supreme Court and others, say clearly that is not the situation. No statement is needed. However, if you participate in a scam that leads to a statement, it is. With that, unless you have any questions of me, I thank you very much, and I will save my time. I might add that one of the AC briefs, for the first time, very first time, never heard before Judge Peckman raise the issue, well, there was no in connection with the sale of securities here. That's dispensed with very quickly because one has only to read the facts. You know, when they did the three-quarter deal, the triangles, they did them the day before the end of each quarter, in connection with putting out the price of stock. Those are all, those facts are repeated all through. Thank you, Roberts. The question I have that you could think about and address when you do your rebuttal time is that when we look at these other segments of Rule 10b-5. A and C. Right. As I understand it, the Supreme Court has said that those, that that rule will not be enforced if it goes beyond the statute itself. In other words, we have to, for there to be liability, there has to be a violation of the statute. That is correct. The rule is fine to the extent it implements the statute, but if the rule goes outside the statute, then the rule won't have any force. And I will respond to that when I, thank you. I noticed that in the brief answer. Thank you so much. Okay, Mr. Barber. Let's add five minutes to the defendant's time, please. Thank you, Your Honor. May it please the Court, my name is Peter Barber and I represent Time Warner. I wanted to respond first to Judge Beeser, a question about why the defendants here are called business partner defendants. And I understand that it's an awkward term. It came about because Mr. Kvatchet and his plaintiffs had a whole separate litigation against Homestore, insider defendants at Homestore, and Homestore's auditor. And that case has proceeded, and I believe most of it has settled. The reason my client and the other defendants here were called business partner defendants was to distinguish them from these other defendants that were being prosecuted. I understand it's an awkward term, but that was the term used. The reason they're business partners is it's alleged that they were entering into business transactions with Homestore. I also wanted to make one thing clear at the beginning. Mr. Kvatchet referred several times to what the defendants have allegedly admitted in this case. We're at the motion to dismiss stage. No defendant has admitted anything. As I understand it, you haven't admitted anything, but you take the position that we have to accept the allegations of the complaint as true for purposes of dismissal. Absolutely, Your Honor. In our view, this case involves a straightforward application of central bank and this court's opinions, applying central bank and distinguishing primary liability from aiding and abetting liability in cases involving misrepresentations, alleged misrepresentations. In central bank, the Supreme Court construing the text of Section 10B said two important things. One, there's a material and important distinction between a primary act that violates the securities laws and simply aiding and abetting someone else. And the court held that in a private civil action, which this is, there is no liability for aiding and abetting. There's only a liability for primary acts in contravention of Section 10B and Rule 10B-5. Now, after central bank was decided, the SEC and a lot of other parties went to Congress and said, you should amend this statute to cover aiding and abetting liability because if you don't, then people who don't actually make misrepresentations might not be held liable in misrepresentation cases. And Congress said no. Congress said, among other things, it was worried about frivolous shareholder lawsuits and it said, we'll allow the SEC in an enforcement capacity to pursue aiding and abetting claims, but we won't allow private civil aiding and abetting actions. And we would submit that this is a clear example of allegations involving simply aiding and abetting and not a primary violation. I wanted to turn to what conduct is actually alleged here because I think that's important and I don't think it was adequately covered in the prior argument. And I also want to point out that it was the conduct issue here that was the focus of Judge Peckman's decision below. Yes, Judge Peckman did use the term significant relationship. She did that in describing prior 10B cases. And she found that in most cases where people are held primarily liable, it's because they have a significant relationship. But she did not in any way say that there was a per se test under which only those people with so-called special relationships or significant relationships can be held liable. She focused on the actual conduct that was alleged. So what was alleged here? This is a case about misrepresentations made by Homestore to Homestore investors relating to Homestore's financial statements. It is alleged that those misstatements and those misstatements alone caused harm to Homestore or shareholders because they affected the price of Homestore securities. It's not alleged that my client or the other defendants here made any misrepresentations to Homestore investors or had any duty to Homestore investors. It's not alleged that we had any role whatsoever in helping create misrepresentations that were made by Homestore. We had no role in their drafting of their financial statements. It's also not alleged that the defendants here had any role in the accounting for these transactions. And that's a key concept here. It's not only not disputed that Homestore controlled its own accounting, but it's undisputed that Homestore could have accounted for these transactions properly had it chosen to do so. The transactions we're talking about, and Mr. Kachet describes them with great color, they're basically round-trip transactions. The allegation is Homestore was paying money to one business partner or defendant in one transaction and receiving it back in a related transaction. There's nothing particularly wrong about a round-trip transaction. It happens all the time. Every time you buy a computer and you get a rebate, or you buy something and you turn it back in and get a refund, that's a round-trip transaction. And those can be accounted for properly. What you do under the accounting rules when required is you net the money you paid out against the money you received back, and you only record as revenue the difference between the two. It's not disputed here that if Homestore had actually netted the revenues it paid out against the revenues it received back, there would have been no misrepresentations. And again, it's not alleged that my client or any of the other defendants here had any role whatsoever in Homestore's accounting. It's also not alleged that investors, Homestore investors, were aware of the transactions entered into between the Homestore and my client, much less that they relied on them. These were transactions, business transactions, exchanging goods and services and revenues. A lot of it was advertising transactions. Those transactions were not visible to shareholders. But the shareholders relied on the revenue stream of Homestore, as reported by Homestore. And these transactions affected that. I guess the question is, where does that leave us legally? Well, I think helping is actually a really important term here, because if you just help someone do something bad under the securities laws, that's the definition of aiding and abetting. Yeah, but it may be that being a conspirator, if that's what they were, you know, knowing there's a phony scheme to cook the books of Homestore, if they knew that, and I'm not saying they did, but if that's the allegation, that that's more than just helping. That's being an active participant in something. Well, it's being an active participant in the business transaction that could have been reported properly, and then there would have been no misrepresentations. I think that's the quintessential definition of aiding and abetting, which is providing substantial assistance to someone else who's doing the prohibited act. Again, the prohibited act here, the connection to the securities laws, is the misrepresentations made by the Homestore investors. I also wanted to point out that this court already has an established test for distinguishing between primary and aiding and abetting liability in misrepresentation cases, which is what we have here today. It's an alleged misrepresentation case. Under this court's test, speakers can be primarily liable, and non-speakers can be primarily liable, but only if they substantially participate and have an intricate involvement in actually creating the misstatement by the primary violator. There's simply no way that you can find allegations of that in this complaint. There's no allegation that any of these defendants had any role, in any way, touched the financial statements or the misrepresentations allegedly made by Homestore. So we would submit under this court's established test, there's no primary liability here. Mr. Kachet referred to the Cooper v. Pickett case, which is featured largely in a number of the plaintiffs' and Amici briefs in this case. Cooper v. Pickett was a straightforward application of this court's substantial participation and intricate involvement test. It's a case where the defendant was allegedly providing misstatements to securities analysts, knowing and intending that they would simply be passed on to investors. In every sense, the defendant there was substantially participating in actually creating these misrepresentations, handing over the misstatements to go to the securities analysts, knowing that they would go to investors. There's certainly some discussion in that case about subsections A and C, but the actual holding is a straightforward application of the substantial participation test. A lot of time is spent in the plaintiffs' briefs here on the question of what is a scheme to defraud. But merely adding the allegation that the defendants here engaged in a scheme to defraud doesn't change anything, because schemes to defraud don't happen in a vacuum. You have to focus on who is allegedly scheming to do what and with whom. And here, the only scheme that's alleged, as Judge Peckman held below, is a scheme to misrepresent. It was a scheme by Homestore to misrepresent to its shareholders. But my client and the other defendants here were not participants in those representations. They were at most assisting. It's alleged that they were at most assisting Homestore in making those misrepresentations. There's actually a very, I think, interesting quote from the Howard v. Everett case. It's one of the cases this Court decided applying the substantial participation and intricate involvement test. And the Court said, There is a significant difference, however, between mere participation in a scheme to misrepresent and those directly attesting to the truth of a statement by making, in the ordinary sense, that statement. This is a case in which my client and the other clients are alleged to have participated in a scheme to misrepresent. But it is not alleged that they made, in the ordinary sense, the statements that they gave rise to the alleged liability here. It also makes no difference whether we look at Rule 10b-5 subsections A or B or C. As I think was pointed out by Judge Gould, the Supreme Court has made clear that the scope of Rule 10b-5 cannot extend further than the scope of Section 10b, pursuant to which it was promulgated. And it's also clear that Section 10b only reaches manipulation and deception. The actual words of the statute make it unlawful to use or employ, in connection with the purchase or sale of a security, any manipulative or deceptive device or contrivance. There's no question that this case doesn't involve the manipulation prong of Section 10b. Manipulation refers to certain practices such as wash sales and rigged bids that actually artificially affect market activity. This is clearly a case arising under the deception prong of Section 10b. And as the Court said in Central Bank, deception for purposes of Section 10b means the making of a material misrepresentation or omission. In fact, if you go through the cases that this Court has decided- You say it only covers that? That's- I don't read it necessarily as going that far and definitively stating that, nor do I think this Court would need to say something to that effect in order for my clients to prevail. I would add two things about that. First, the cases that are cited below and were mentioned by Mr. Kachet, the Zanford case, the affiliated Ute case, the O'Hagan case, those are not cases staking out new theories of scheme liability. Those are straightforward omissions cases. In every one of those cases, the holding of the Court turned it on the fact that the Court found that the defendant had a duty to disclose and failed to disclose and therefore deceived someone. So those cases don't stake out any new territory. But I would also add that we don't need to think about what forms of deception might exist beyond misrepresentations or omissions in this case because this is a misrepresentation case. The only connection to investors in this case is the misrepresentations, the alleged misrepresentations made by Homestore to Homestore's investors. There's no deceptive conduct in this case that is alleged independent of the misrepresentations. It's alleged that the misrepresentations caused the harm and the question this Court has to decide is whether my client and the other defendants were so connected with those misrepresentations that they can be essentially liable as a speaker. That's the test. Are we effectively a speaker of those misrepresentations? And under the existing authority of the Howard v. Everett case and others, it's quite clear that we were not. It is alleged basically that we helped Homestore do something bad. So I think it's irrelevant whether we focus on subsection A or B or C of Rule 10b-5. No matter what we focus on, there has to be some sort of a deception. The only deception that's alleged here is a deception of Homestore investors by Homestore. It is certainly alleged, and this features largely in the SEC's proposed test here, that we engaged in deceptive acts. And I do want to focus a minute on the SEC's proposed test because I know the SEC has weighed in this case and I think we need to respond to that. The SEC's proposed test for primary liability in this case would focus on a very broad definition of deceptive act and a very broad definition of a scheme to defraud. The SEC did not appear in the trial court at all as a friend of the court there, did they? That's correct, Your Honor. The first time they got in, it was here. Yes, this brief was the first brief in the case by the SEC. So they basically proposed a primary purpose and effect test, right? Well, they say that you have to have engaged in a deceptive act as part of a scheme and that a deceptive act can involve a transaction if the primary purpose and effect of the transaction is to create the impression of false revenues. That's their test. First of all, I think we have to focus on what... And they say that's not aiding and abetting. That is what they say, and to that extent we respectfully disagree, Your Honor. A deceptive act, we need again to focus on who's allegedly deceiving whom. My client isn't alleged to have deceived Homestore in this case. That was the party that my client was dealing with, with Homestore. To the contrary, the allegation is that my client was in cahoots with Homestore. And it's also not alleged that my client did or said anything that actually directly reached a shareholder and somehow deceived them. It's not alleged that the shareholders were even aware of the transactions that my client entered into in this case. But it is alleged that your client conspired with Homestore to do something that permitted Homestore to falsify or magnify its revenue stream. That is the basic... My question is, I guess, whether that is aiding and abetting within the meaning of central bank or whether that's something else. I think the law typically treats conspiracy as simply another form of secondary liability, just like aiding and abetting. So whether we call it conspiracy, substantial assistance, aiding or abetting, the allegation is simply that my client was allegedly helping them do a bad thing. I did want to focus on... I think there's three basic problems with the SEC's proposed test here. And one actually does involve the in connection with the requirement, which actually was briefed below. And the problem with the SEC's definition of deceptive act is that it's completely divorced from the securities markets and investors. There's no in connection here. My client enters into a business transaction, buys or sells ads with Homestore. There's no connection with that transaction and the securities markets. There's no in connection with. The connection comes when Homestore accounts for that transaction improperly and then misrepresents revenues to its shareholders. I also wanted to mention that this concept of false revenues comes up a lot in the plaintiff's brief below and in the SEC's brief below. We would submit that there is no such thing as false revenues or true revenues. There are revenues. And then the issue is how are they accounted for? And there are accounting rules that dictate how revenues are to be accounted for. And there's no question again here that if Homestore had accounted for these transactions, there would have been no misrepresentation and therefore no false revenues or true revenues. The SEC, by also focusing on the primary purpose of a transaction in defining a deceptive act, impermissibly in our view, turns liability on a defendant's state of mind. The SEC says that if you engage in a so-called legitimate transaction, even if you know that your counterparty is going to misrepresent the revenues from that transaction, that's at most aiding and abetting. But they say if you had the purpose of creating false revenues, that might mean that you're primarily liable. The securities laws don't focus just on a defendant's state of mind. There's a conduct requirement as well. And it's not enough to have a test turn on what the defendant's state of mind was. Third, and I think perhaps the most important problem with the SEC's test and with a lot of the arguments we've heard from the plaintiff, is that they don't take into account the bedrock holding in Central Bank that there's a reliance requirement here. The problem with aiding and abetting liability in the Supreme Court's view is that it would eviscerate the reliance requirement of Section 10b. You can't rely on something you're not aware of. The only reliance that's alleged here, of course, is fraud-on-the-market type reliance, under which we would presume that the securities markets reflect all available public information about a security. Here, there was no public information about the transactions between my client and Home Store. The only public information was the misrepresentations made by Home Store. The SEC's test, in fact, for reliance in this case, talks in terms of consequences flowing from certain actions, even if there are subsequent links in the chain. They basically argue that because the acts that are alleged have been entered into by my client and the other business partners, if you will, because that was a necessary link in the chain leading to Home Store making its misrepresentations, that that's adequate to fulfill the reliance requirement. I would submit that has to be wrong, because if you accept that view of reliance, then in every single aiding and abetting case, you would find reliance satisfied. But the Supreme Court said that one of the reasons we can't have aiding and abetting liability is because of the reliance requirement. And finally, I wanted to point out, I think a really important point here, is that the Supreme Court says that there is a meaningful distinction between primary liability and aiding and abetting liability in a 10b-5 case. And they said that that was necessary in part to avoid meritless securities litigation. But here, the SEC and the plaintiff propose a test under which every conceivable form of aiding and abetting liability could be converted into primary liability simply by saying that someone engaged in a deceptive act as part of a scheme that ultimately led to a misrepresentation by someone else. In every single case where you would give substantial assistance to someone, it could be alleged that you engaged in a scheme with them to do a bad thing. The SEC has proposed a number of hypotheticals in its brief to try and deal with the distinctions between primary and aiding and abetting liability. There are two basic problems, I think, with those hypotheticals. One is that they're all phrased in terms of what may or could constitute a primary violation of the securities laws. The SEC doesn't actually come out and say what actually would constitute. They only talk in terms of what might or may or could constitute a primary violation. And so I would submit that their hypotheticals are not particularly helpful here. And it's also notable that the SEC didn't actually take a position that my client or the other defendants here actually would be liable if Mr. Kechaia could prove all the facts in his complaint. They didn't say that. They just proposed a test and talked in the abstract about what might or may or could constitute a primary violation. And the other problem with the SEC's proposed test is that it turns on conclusory assertions such as what is a legitimate transaction, what is a sham transaction, what is a fictional transaction versus a legitimate transaction, as opposed to actually focusing on the underlying conduct of the defendants. Thank you. If there are no further questions, that will conclude my remarks. I don't see any questions. Thank you, Your Honor. Mr. Barber. Good morning, Your Honor. My name is Sam Cadet from Skadden Laws. We represent Send-In Corporation. And as Mr. Barber said, if I could have 30 seconds to respond to— Take two minutes or three minutes if you need it. Well, I don't think I will. We'll add some time to—we gave more time to the other side. Thank you, Judge. During Mr. Kechaia's argument, he alluded to an October 27, 2000, press release issued by Homestore and my client in which it was announced that Homestore was going to acquire from Send-In two businesses, Move.com and Welcome Wagon, in exchange for $760 million of Homestore stock. Mr. Kechaia said $760,000. It was actually $760 million of Homestore stock. That transaction closed in February of 2001. And ironically, it made my client the single biggest victim of the Homestore accounting fraud because those shares, none of which were ever sold, ultimately became worthless. Now, the point here is that this argument, which Mr. Kechaia makes orally, does not appear in the plaintiff's opening brief on this appeal. It shows up for the first time in reply. And the first point I wanted to make is that under the decisions of this court, that means the argument has been waived. I have a couple of them here. One, Smith v. Marsh at 194 Fed Third, 1045. The jump site is 1052. Arguments raised in reply for the first time are deemed waived. That's what's happened on this appeal. Secondly, Judge, if you look at the complaint, the complaint devotes 90 paragraphs to cataloging allegedly false statements. In paragraphs 186 to 272, it gives a litany of false statements allegedly made by Homestore. This statement does not appear anywhere. This October 27, 2000 press release does not appear anywhere in those 90 paragraphs. Rather, it appears in a completely different section of the complaint, paragraph 368, generally dealing with send-in as dealing with Homestore. So we submit, A, the argument has been waived, and, B, the complaint doesn't challenge anything in that press release as false, let alone explain why. So we don't think even that narrow press release can salvage this complaint against my client. Thank you, Judge. Your Honor, this is Carl Kravitz for David Colburn. I just wanted to make one point. Judge Gould asked the question about whether conspiring might be more than helping for purposes of this. And I just wanted to point out that the Ninth Circuit, in In re Glenfiddich securities litigation, 60 F3, 591, 1995 decision, held specifically that conspiring is a form of secondary liability that is barred by Central Bank. Let me work backwards. While it's all fresh in our mind, Counsel just said we waived some argument about the press release, the joint press release. For the record, it's right here. It's found in paragraph 368 of the complaint. It is absolutely a word-for-word. It goes over to page, paragraph 374, explaining the falsity. I think what Counsel was arguing was that that issue wasn't in your opening brief. What we said in our opening brief was that ascendant committed fraudulent acts, all of which were relayed to the public. Did we spell out the October 27th? The answer is no. When they said in their opposition, we did nothing wrong. In reply, we said try looking at paragraph 374, and you will see the exact quote. Let me now answer your question, and you asked about the prongs, and you asked about the statute and the rule. You said think about that while I was sitting there. I did think about it very quickly, and I pulled out Hockfelder. U.S. Supreme Court said, quote, We do not think it sound to dismiss a complaint merely because the alleged scheme does not involve the type of fraud that is usually associated with the sale and purchase of securities. Quote, We believe that Section 10b and Rule 10b-5 prohibit all fraudulent schemes in connection with the purchase or sale of security, whether the artifices employed involve garden-type variety or unique forms of deception. The Supreme Court in both Hockfelder and in Banker's life upheld the corresponding rule as it applied to the statute. Now, counsel just said that what we have here is a case of deception, and therefore if it is deception, it had to be communicated to the public because that's something you can't deceive without telling home store investors about it, like the teacher's pension fund that I represent. One would only have to look at paragraphs 91, 329, 335, and 355, where we specifically state AOL knew precisely how home store was reporting to the public and operated at the end of each quarter. As a matter of fact, through the use of the U.S. Attorney's statements, we were able to ascertain, as alleged in the complaint, that they would get on the phone two days before the reporting period at the end of the quarter. In one instance, they waited until midnight to get the phone call as to whether or not they'd do the round trip. So when counsel says they didn't know anything about it, how they were reporting it, one has only to read the complaint. In Cooper, excuse me, in Zanford, the court said, and this is just three years ago, each time manipulative acts or deceptions took place, that conduct, quote, and here's the quote, without more was a fraud. That's found at Zanford at page 815. Counsel, I will. Lastly, the issue is, did the conduct get out to the public? This court in Cooper said specifically that the test is that one or more defendants can operate a manipulative, deceptive act, and they go on to read Cooper, that's the language, that says one or more can participate. It doesn't matter if it's just one person who's reporting the fraud to the investing public. And obviously this was a lengthy and long case, unless you have any other questions of me, Judge Gould. I think we've covered it well in our briefs. I might add that there are other AC briefs filed to which we spoke. We're studying all the briefs, and we appreciate the excellent arguments on both sides. Thank you very much, Your Honors. Very challenging case, so California State Teachers Retirement System v. Home Store will be submitted.
judges: Beezer, Gould, T. Nelson